UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 8:17-cr-266-T-23JSS

JOSEPH BISHOP
        a/k/a Joseph Dean Bishop

## UNITED STATES' OPPOSITION TO
## DEFENDANT'S MOTION TO SUPPRESS

This Court should deny Defendant Joseph Bishop's motion to suppress
because law-enforcement officers conducting a legal traffic stop do not need an
individual's consent to order him out of the vehicle and to pat him down for
weapons. The evidence in this case shows that the law-enforcement officers
had legal grounds upon which to stop the defendant's car and that they did not
unlawfully prolong the stop's duration. Accordingly, there are no grounds
upon which to suppress the firearms and ammunition that the officers lawfully
seized during the traffic stop.

At the evidentiary hearing set by the Court, the United States
anticipates that witnesses will testify as outlined below:

### I.    Factual Background

On February 23, 2017, Tampa Police Department ("TPD") officer
Matthew Drumsta stopped a car because it had a missing tag light, which is a

traffic violation under Florida law. *See* Fla. Stat. § 316.221.  The traffic stop

occurred at 40th Street North and 19th Avenue East, in Hillsborough County,

located in the Middle District of Florida. Officer Drumsta approached the car,

found two occupants, and told them why he had stopped the car.

The driver, the defendant's friend, informed Officer Drumsta that he

did not have the registration or insurance card for the car because it had only

recently been purchased. The defendant, seated in the passenger seat, said that

he owned the car, explaining that his friend was driving because the defendant

had been drinking. The driver and/or the defendant then gave Officer

Drumsta some identification information but no registration, insurance, or

ownership information. Officer Drumsta took the information and returned to

his police car.

Officer Drumsta then ran the occupants' background information on

the computer in his car. He discovered that the defendant had a criminal

history. In particular, Officer Drumsta learned that the defendant was a

convicted felon with prior criminal convictions (including possessing a firearm

after having been convicted of a felony offense). He also learned that TPD –

only a few months earlier – had recovered several firearms from the

defendant's residence.

As Officer Drumsta ran the defendant's background information,

Officer Michael Hinson arrived on the scene. Officer Drumsta briefed him on the traffic stop, as well as the information that he had learned about the car's owner and passenger. Officer Drumsta told Officer Hinson that, based on the defendant's criminal history (as well as the TPD's recent seizure of firearms from the defendant's residence), he wanted to verify whether the car contained any firearms or narcotics. The officers returned to the car together.

Officer Drumsta approached the car's passenger-side, where the defendant (and car owner) was seated. Officer Hinson served as his back-up. When the officers approached, the defendant had the car's purchase paperwork, which he had since located, ready for their review.

During this second exchange with the defendant, Officer Drumsta asked whether there were any firearms or narcotics in the car. The defendant responded, "No." Officer Drumsta then asked the defendant if he could search the car. The defendant asked why. Officer Drumsta explained that he wanted to confirm whether the car contained any narcotics or contraband. The defendant then responded to the effect of, "Uhh, sure." In accordance with the TPD's safety procedures for searching a car, Officer Drumsta asked the defendant to step out of the car. The defendant did so, still holding the car's ownership paperwork.

Meanwhile, Officer Hinson had moved to the driver's side of the car.

He did so because he had not detected anything of concern at the passenger side of the car – he did not see or hear anything to suggest that the defendant was resisting Officer Drumsta's request for consent to search. Officer Hinson asked the driver if he would consent to a search of his person. The driver agreed and exited the car. Officer Hinson did not find anything during the patdown, and he asked the driver to sit on the curb, un-handcuffed. Officer Hinson then returned to the passenger side to assist Officer Drumsta. As he did so, he could see Officer Drumsta speaking with the defendant. Although he could not clearly hear the defendant's responses, nothing about the defendant's mannerisms or demeanor suggested to Officer Hinson that the defendant was being uncooperative, reluctant, or resistant.

The defendant exited the car but shortly thereafter re-entered it to gather or review additional paperwork in the front seat area. During the defendant's movements, Officer Drumsta observed a silver clip sticking out of the defendant's pocket. Based on his experience and training, Officer Drumsta recognized the clip as part of a folding knife. Officer Drumsta asked the defendant whether there was anything else on the defendant that he needed to know about. (Officer Hinson heard his fellow officer ask this question.) The defendant did not immediately answer and began to turn his body away from the officer. That action served as a red flag for both officers, as the defendant's

movements hid part of his body from at least one officer's view.

The defendant then responded, "Yes" and, "A firearm." In light of the defendant's response, his criminal history, and for officer safety purposes, Officer Drumsta handcuffed the defendant. As he did so, he could see the grip of a .380 pistol (subsequently identified to be a Bersa) sticking out of the defendant's waistband. He informed Officer Hinson, who seized the firearm from the defendant's person and rendered it safe. Officer Drumsta continued his pat down and moved to the defendant's other side. He found a Taurus, semi-automatic, 9mm pistol in his pant pocket, which Officer Hinson seized and subsequently made safe.

The entire stop – from initiation to the point of formal arrest – took approximately ten minutes.

Once the defendant was under arrest, Officer Drumsta fully patted down his person. He found a plastic baggy containing a substance that appeared to be marijuana. The officers next conducted an inventory search of the car according to TPD protocol. They found a metal pipe and clear jeweler's bag containing suspected marijuana. Behind the passenger seat (in which the defendant had been sitting), they found a backpack containing a Taurus holster and a black magazine with ammunition in it.

After securing the firearms, the officers determined that the Bersa pistol

had three live rounds in its magazine. The Taurus had one live round in the chamber, ten live rounds in the magazine, and eleven live rounds in a spare magazine in the car.

## II.   <u>Memorandum of Law</u>[1]

### A. The Grounds for the Traffic Stop Were Lawful

The defendant does not dispute that Officer Drumsta had grounds to stop his car. *See* Doc. 28 at 2. Nor could he. A review of the officer's dash cam video shows that the defendant's car's tag light was inoperable, which is a violation of Fla. Stat. § 316.221. Thus, the officer legally stopped the defendant's car. When a police officer stops a vehicle based on probable cause that the driver has committed a traffic violation, the car is lawfully stopped, and the occupants are lawfully seized.  *See Delaware v. Prouse,* 440 U.S. 648, 653 (1979); *Pennsylvania v. Mimms,* 434 U.S. 106, 109 (1977) (when an officer observes a traffic law violation, "there is no question about the propriety of the initial restrictions" imposed by a traffic stop).

---

[1] The defendant's motion to suppress is untimely and should be denied on that ground. Doc. 8; *see also United States v. Jones*, 241 F. App'x 676, (11th Cir. 2007) ("A district court may deny a motion to suppress as untimely without conducting a *voir dire* hearing, even where the motion concerns the voluntariness of statements made to the police."). Because the Court has directed the United States to respond to the defendant's motion – filed after the Court denied both the defendant's untimely motion for a continuance and untimely motion for an extension of time in which to file a suppression motion – the United States addresses the merits of the motion.

## B. Officers May Lawfully Perform Computer Checks on a Car's Occupants' Criminal Histories During a Traffic Stop

Because the initial stop was legal, Officer Drumsta, during the course of investigating the stop, could "conduct a variety of checks on the driver and his car, including questioning the driver about the traffic violation, requesting consent to search the car, and running a computer check for outstanding warrants." *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999).

According to Officer Drumsta, at the outset of the traffic stop, the driver and/or the defendant provided him with identification information, which he brought back to his police car so that he could review the occupants' histories. Officer Drumsta's review of the car's occupants' histories was proper. *See United States v. Purcell,* 236 F.3d 1274, 1278 (11th Cir. 2001) (explaining that criminal-history checks during traffic stops are "routine," "reasonable," "minimally intrusive," and "justified for officer safety"). Indeed, many courts have recognized that knowledge as to a car occupant's criminal history will be relevant to the officer's safety during the course of the traffic stop. *See, e.g., United States v. Wood,* 106 F.3d 942, 945 (10th Cir.1997) (criminal history check justified for officer safety); *United States v. Finke,* 85 F.3d 1275, 1280 (7th Cir.1996) (where a criminal history inquiry is reasonably contemporaneous with the license and warrant check, it is both reasonable and justified); *United States v. Crain,* 33 F.3d 480, 483 (5th Cir.1994) (approving officers' computer

7

check during traffic stop, which included a license registration and criminal

history request).

### C. Officers May Lawfully Ask Follow Up Questions About Information Learned During A Traffic Stop

When Officer Drumsta learned that the defendant had a criminal

history, which included a prior conviction for unlawful possession of a

firearm, as well as a recent police seizure of multiple firearms from the

defendant's house, he decided to ask the defendant a few follow-up questions.

Specifically, the officer decided to ask whether the defendant's car contained

any guns or drugs.

The Supreme Court has long held that "[a]n officer's inquiries into

matters unrelated to the justification for the traffic stop . . . do not convert the

encounter into something other than a lawful seizure, so long as those

inquiries do not measurably extend the duration of the stop." *Arizona v.*

*Johnson*, 555 U.S. 323, 333 (2009); *Muehler v. Mena,* 544 U.S. 93, 100–101

(2005) (rejecting contention that officers, during course of a search warrant's

execution, could not question a detained house occupant about a subject – i.e.,

the occupant's immigration status – wholly unrelated to the grounds for the

search); *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (the Supreme Court has

"held repeatedly that mere police questioning does not constitute a seizure,"

and that "[e]ven when officers have no basis for suspecting a particular

individual, they may generally ask questions of that individual; ask to examine

the individual's identification; and request consent to search his . . . luggage").

The Supreme Court's recent decision in *Rodriguez v. United States*, 135 S.

Ct. 1609 (2015), did not change this well-established principle. In fact, the

Supreme Court specifically acknowledged its precedent in which it had

"concluded that the Fourth Amendment tolerated certain unrelated

investigations that did not lengthen the roadside detention," and the Court

reiterated that "[a]n officer . . . may conduct certain unrelated checks during

an otherwise lawful traffic stop." *Rodriguez*, 135 S. Ct. at 1614-15 (citing

*Johnson*, 555 U.S. at 327-28 (describing police questioning as a permissible and

possibly unrelated investigatory action)).

Courts that have applied *Rodriguez*'s holding have similarly recognized

that *Rodriguez* does not restrict an officer's ability to ask questions about

information learned during the course of the traffic stop – particularly

information (like firearm possession) that could affect the officer's or the

public's safety. *See United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) ("An

officer may engage in certain safety measures during a traffic stop," and while

the officer "generally must focus his attention on the initial basis for the stop,"

he "may engage in ordinary inquiries incident to the traffic stop" and may also

"engage in other investigative techniques unrelated to the underlying traffic

infraction or the safety of the officers"(citing *Rodriguez*, 135 S. Ct. at 1614-15)).

Because the law recognizes that "an officer may question the occupants of a car on unrelated topics without impermissibly expanding the scope of a traffic stop," it was entirely proper for Officer Drumsta to ask the defendant a few targeted questions. *Hill*, 852 F.3d at 382; *see also United States v. Shabazz*, 993 F.2d 431 (5th Cir. 1993) (rejecting defendant's argument that "a police officer's questioning, even on a subject unrelated to the purpose of the stop, is itself a Fourth Amendment violation"). Those questions specifically related to information that the officer had acquired during the stop and which implicated reasonable safety concerns on the officer's part. *Purcell*, 236 F.3d at 1280 (officer did not exceed scope of permissible traffic stop when he asked defendants whether they had guns, firearms, or narcotics in their car where officer still was in process of issuing a citation, had not received consistent registration paperwork from the car's occupants, and had learned that one of the occupants had a criminal record); *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996) (vague rental car arrangements plus knowledge of prior criminal involvement permit officer to ask about contraband and weapons).

Moreover, Officer Drumsta's questions did not unlawfully prolong the duration of the traffic stop. *Purcell*, 236 F.3d at 1280 (Supreme Court precedent discussing unrelated questions during a traffic stop focuses "not [on] the

content of the questions, but their impact on the duration of the stop"). When the officers returned to the car, the traffic stop was still ongoing. No ticket or citation had been issued, and no warning had yet been given. In fact, the car's occupants had not even established to whom any such warning or citation should be issued, given that the defendant had verbally claimed ownership to the car, but had not yet provided proof of such vehicle registration, ownership, or even insurance. *Id.* (concluding that officer's question relating to suspected contraband while he was writing out citation and awaiting computer check information did not extend duration of valid traffic stop seizure).

Notably, the defendant also does not dispute that he did not locate his proof-of-purchase paperwork until *after* Officer Drumsta had verified their identification information and had returned to the defendant's car. *See* Doc. 28 at 2 (noting that the defendant "was looking for the proof of purchase papers" when Officer Drumsta initially stopped the car and requested identification information); *id.* at 3 (stating that the defendant had the car's purchase paperwork by the time the officers had returned to the car, engaged in follow-up questions, and ordered the occupants out of the car).

Because the defendant continued to provide the officers with information relevant to the traffic stop when the officers returned to the car, the stop had not concluded. Officer Drumsta's questions on returning to the

car were reasonably "tailored" to "related safety concerns" that had arisen during the stop and did not "measurably extend the duration of the stop." *Rodriguez*, 135 S. Ct. 1614-15 (citing *Johnson*, 555 U.S. at 333).

Thus, because the traffic stop was still ongoing when the officers returned to the car, they did not need reasonable suspicion or consent before they asked the car's occupants to exit the car. *Rodriguez*, 135 S. Ct. at 1614 (recognizing that a reasonable suspicion analysis to further detain a car's occupants only comes into play once a traffic stop has completed); *Hill*, 852 F.3d at 381 (either consent from detained individuals or reasonable suspicion of criminal activity is needed to support extending a completed traffic stop).

### D. Controlling Precedent Recognizes That an Officer May Request Consent to Search a Car During a Traffic Stop

Both Officer Drumsta and the defendant agree that, on returning to the defendant's car, Officer Drumsta asked the defendant if the car contained any illegal contraband, i.e., guns or drugs; that the defendant immediately responded, "No"; that Officer Drumsta then asked if he could conduct a search of the car; that the defendant asked the officer, "Why?"; and that Officer Drumsta explained to him his reasons (i.e., to confirm the car had no guns or drugs).

The law recognizes that a police officer, during the course of a traffic stop, may "conduct a variety of checks on the driver and his car, including . . .

12

requesting consent to search the car." *Simmons*, 172 F.3d at 778; *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) ("An officer conducting a routine traffic stop may request consent to search the vehicle." (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). Thus, Officer Drumsta's request for consent to search the car was proper.

### 1. The Defendant Consented to the Search

According to Officer Drumsta, the defendant verbally consented to the search. Specifically, the defendant responded to the effect of, "Uhhh, sure." That response constitutes consent under the law. *See United States v. Osage*, 235 F.3d 518, 519 (10th Cir. 2000) (noting district court's denial of motion to suppress search where defendant unsuccessfully argued that "yeah, I guess" did not constitute consent). Further, while Fourth Amendment waivers must be voluntary, they need not be knowing or intelligent; in other words, law-enforcement officers do not have to advise people that they have a right to refuse to consent. *Bustamonte*, 412 U.S. at 241.

"In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances." *Purcell,* 236 F.3d at 1281. When assessing the circumstances underlying consent, a court "should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right

to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." *Id.* at 1281.

The facts show that the defendant agreed to a consensual search of the car. First, the measures that the law-enforcement officers used during the traffic stop were not coercive. They did not brandish their weapons. Neither the defendant nor driver was handcuffed or restrained when the officer asked to do the search (in fact, the officers allowed the driver to sit un-handcuffed on the curb once he was outside the car). Moreover, the defendant does not suggest that either officer raised his voice or threatened the defendant.

Second, the defendant cooperated with the officers throughout the stop. The officer instructed the defendant to exit the vehicle, and the defendant complied. While the defendant argues that he felt he had no choice but to exit the car when the officer opened the car door for him, the dash-cam video shows that the defendant's hands were full of paperwork on exiting the vehicle. Nothing about the officer's actions in opening the door shows that the officer did so forcefully or in an intimidating manner. Rather, it appears as though the officer is trying to assist the defendant in exiting with hands visibly full while maintaining control over the door. The officer's more passive approach is reinforced by the fact that he allowed the defendant to return to the front seat area after exiting to gather additional materials.

14

Third, while it is unclear whether the defendant knew that he could refuse the search, his criminal history shows that he had encountered law-enforcement officers on prior occasions.[2] That experience should have instilled in him some understanding of the rights and processes associated with such encounters. Indeed, such an understanding of those rights and processes may have informed the defendant's decision to ask the officer why he wanted to search the car. Fourth, the defendant appeared to respond coherently to the officers' questions. The only factor that arguably cuts away from the defendant's consent is that the car contained potentially incriminating evidence towards him – i.e., a holster and a loaded magazine. But the principal evidence against the defendant was found on his person, not in the car. Thus, the *Purcell* factors show that the defendant's consent was both free and voluntarily.

Furthermore, Officer Hinson had a direct view of Officer Drumsta and the defendant during their exchange. While he could not hear the entire exchange, he could hear Officer Drumsta ask the defendant language to the effect of whether there was anything in the car. Officer Hinson could not clearly hear the defendant's response, but he heard Officer Drumsta ask the defendant to step out of the car. Officer Hinson, who had training and

---

[2] On the date of the stop, the defendant had two prior felony convictions and a number of arrests, including for marijuana possession, battery, and resisting an officer.

experience in traffic stops, did not observe anything in the defendant's mannerisms, tone, or demeanor that signaled or suggested to him that the defendant was unwilling to exit the car or was giving his partner pushback.

Finally, the dash-cam video shows a roadside encounter in which the officers appear "low-key and professional," and the occupants at all times look compliant. *See Purcell*, 236 F.3d at 1281 (citing as factor supporting consensual nature of officer and defendant's interaction that the videotaped encounter "appear[ed] quite low-key and professional," with "no indication . . . that [the defendant] was intimidated or browbeaten into consenting").

2. **Even if the Defendant Did Not Consent to the Search, the Officers May Lawfully Take Safety Measures During a Traffic Stop, Including Ordering Occupants Out of a Car and Conducting a Protective Search**

Even if the defendant did not consent to a search of the car, however, the reasonableness or legality of the officers' actions is still not in doubt. The law recognizes that an officer may take measures to ensure his personal safety during the course of a traffic stop. *Purcell*, 236 F.3d at 1277-78*; see also Rodriguez*, 135 S. Ct. at 1614. Those steps may include "conducting a protective search of the driver, the passengers, and the vehicle." *Purcell*, 236 F.3d at 1278; *see also Mimms*, 434 U.S. at 111 (officer may conduct protective search of driver and passengers during traffic stop).

Those steps also may include asking a car's occupants to exit the

16

vehicle. *See Mimms*, 434 U.S. 106 (where police officers on routine patrol saw defendant driving a car with an expired license plate and lawfully stopped vehicle to issue a traffic summons, an officer's order that defendant exit the car was reasonable under Fourth Amendment, notwithstanding that officers had no reason to suspect foul play from defendant at time of stop as there had been nothing unusual or suspicious about his behavior); *see also Maryland v. Wilson*, 519 U.S. 408, 415 (1997) ("[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop.").

One of the principal reasons that an officer may undertake such actions – without needing a car occupant's consent – is because the law repeatedly recognizes that traffic stops are inherently dangerous for officers. *See Johnson*, 555 U.S. at 331 (discussing Supreme Court precedent recognizing that "traffic stops are especially fraught with danger to police officers"); *Mimms*, 434 U.S. at 111 ("[W]e have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile."); *See Wilson*, 519 U.S. at 413 ("[T]he same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger.").

As previously set forth, the traffic stop was still ongoing when Officer Drumsta asked the defendant for consent to search the car and then instructed him to exit it. The defendant was still providing the officer with vehicle

registration paperwork, which would assist the officer in determining to whom any citation or warning should be directed, and also, whether additional violations might be at issue. Thus, Officer Drumsta's ordering of the defendant out of the car so that he could safely search was proper, particularly given his knowledge as to the defendant's criminal history and recent firearm involvement.

### E. An Officer May Lawfully Conduct Protective Patdowns of Occupants During a Traffic Stop

When the defendant stepped out of the car, Officer Drumsta noticed what he recognized to be part of a knife sticking out of the defendant's pants pocket. The law allowed Officer Drumsta to conduct an immediate patdown of the defendant when he observed what he believed to be a weapon on the defendant's body. *See Terry v. Ohio*, 392 U.S. 1, 30-31 (1968) (where an officer observes conduct that causes him to reasonably believe that the person with whom he is dealing might be armed and dangerous, the officer may make reasonable inquiries and "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him").

Officer Drumsta, however, took a more cautious approach. Not wanting to escalate the situation unnecessarily, he made additional inquiries before doing a patdown. He asked the defendant whether he had anything else

on his person that the officer needed to know about. The defendant did not immediately respond and began moving away from the officer. Officer Drumsta repeated his question, waited for the defendant's answer ("yes" and "a firearm"), and only then initiated the patdown. *Johnson*, 555 U.S. 323 (holding no Fourth Amendment violation where officers patrolled a neighborhood associated with a gang and stopped a car after a license plate check showed its registration had been suspended for insurance-related violations; officer wanted to question backseat passenger on possible gang affiliation, and thus, had passenger exit car, conducted pat down, and recovered a firearm); *see also Knowles v. Iowa*, 525 U.S. 113, 117-18 (1998) (officers who conduct "routine traffic stop[s]" may "perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous"). That patdown was limited to a search for weapons, which the officers located. That patdown, performed after observing a weapon on the defendant's person and learning that he had a firearm on him, was reasonable.

### III.   <u>Conclusion</u>

The United States respectfully requests that the Court deny the

defendant's motion to suppress the evidence obtained against him as a result

of the lawful February 23, 2017 traffic stop.

Respectfully submitted,

W. STEPHEN MULDROW
Acting United States Attorney


By:   */s/ Kaitlin R. O'Donnell*
KAITLIN R. O'DONNELL
Assistant United States Attorney
United States Attorney No. 167
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6103
E-Mail: Kaitlin.ODonnell@usdoj.gov

20

**U.S. v. Joseph Bishop**                    **Case No. 8:17-cr-266-T-23JSS**

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2017, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which

will send a notice of electronic filing to the following:

Howard Anderson, Esq.


*/s/ Kaitlin R. O'Donnell*
KAITLIN R. O'DONNELL
Assistant United States Attorney
United States Attorney No. 167
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6103
E-Mail: Kaitlin.ODonnell@usdoj.gov

21